UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

YURI KHRAMEEV, a/k/a "Colonel Yuri,"
KIRILL KHRAMEEV,
OEMIS ROMAGOZA DURRUTHY,
YAIDEL DELGADO SUAREZ, a/k/a "Viking," and
ANGEL EDUARDO CASTRO,

Defendants.

**SEALED INDICTMENT**

26 Cr.

26 CRIM 426

The Grand Jury charges:

**OVERVIEW OF THE RUSSIAN INTELLIGENCE SERVICES NETWORK**

1. Since at least in or about 2024, a network of individuals working for the intelligence services of the Russian Federation (the "RIS Network") has conspired to conduct and conducted attacks and murder around the world, including within the United States. The RIS Network has, among other things, endeavored to surveil and murder Russian dissidents residing in both Europe and the United States; established a criminal network that has committed and attempted to commit acts of terrorism against civilian and military infrastructure in European countries that are aligned, or perceived to be aligned, with Ukraine; and sought to recruit, and recruited, individuals from and within the United States and elsewhere to carry out these acts.

2. Three high-ranking members of the RIS Network are YURI KHRAMEEV, a/k/a "Colonel Yuri," the defendant, a former colonel in the Russian intelligence services; KIRILL KHRAMEEV, the defendant, an officer in the Federal Security Service of Russia ("FSB"[1]), and

[1]The FSB is Russia's principal security agency and the successor agency to the Soviet Union's Committee for State Security, otherwise known as the KGB. The FSB is believed to engage in, among other things, intelligence gathering and covert operations outside of Russia.

YURI KHRAMEEV's son; and OEMIS ROMAGOZA DURRUTHY, the defendant, a Cuban national and an influential member of the Cuban diaspora living in Russia who has coordinated attacks for the RIS Network. A fourth member of the RIS Network is YAIDEL DELGADO SUAREZ, a/k/a "Viking," the defendant, a prolific recruiter for the RIS Network who, alongside ANGEL EDUARDO CASTRO, the defendant, and YURI KHRAMEEV, recruited an individual living in the United States to carry out the assassination of a prominent Russian dissident that the RIS Network suspected of residing in the Washington, D.C., area. SUAREZ attempted to recruit multiple U.S.-based individuals to carry out the pre-operational surveillance and murder.

**THE RUSSIAN FEDERATION TARGETS ENEMIES AROUND THE WORLD**

3. The RIS Network is one arm of the Russian Federation's apparatus used to carry out external attacks, including murder, around the world. The Russian Federation's external operations have focused on Russian dissidents and defectors and, particularly since the Russian invasion of Ukraine in 2022, on nations perceived as Ukrainian allies. The following examples illustrate the Russian Federation's targeting of dissidents or perceived enemies of the state around the world, or murders connected to the expression of criticism aimed at the Russian Federation:

a. In or about 2004, Paul Klebnikov, an American journalist and historian, was assassinated in Moscow. Before his death, he was chief editor of the Russian edition of an American magazine. On or about May 20, 2014, the U.S. Department of the Treasury (the "Treasury Department") sanctioned an individual, Musa Vakhayev, for his involvement in Klebnikov's murder, noting that Klebnikov was "working to expose illegal activity carried out by officials of the Russian government." In the announcement, the Treasury Department also noted that it had previously sanctioned, in April 2013, another individual, Kazbek Dukuzov, for his own role in the murder. On or about July 12, 2014, the U.S. Embassy in Russia commemorated

Klebnikov's death and noted, in part, that "[t]he United States remains concerned about the ongoing trend of intimidation and violence against those who express dissent across Russia, including independent journalists, political opposition figures, and civil society representatives." And on or about July 8, 2016, a spokesperson for the U.S. Department of State (the "State Department") marked the anniversary of Klebnikov's murder by "call[ing] upon the Russian government to respect freedom of expression, to aggressively pursue those who commit acts of violence against journalists – including those responsible for [Klebnikov's] death – and to end the culture of impunity."

b. In or about 2006, Alexander Litvinenko, a former lieutenant-colonel in the FSB and vocal critic of Russian President Vladimir Putin, was assassinated in the United Kingdom. Litvinenko was found to have the extremely rare, highly radioactive isotope Polonium-210 in his system after his death. In or about 2016, an inquiry in the United Kingdom concluded that the Litvinenko murder was likely an FSB operation and "probably" approved by Russian President Vladimir Putin. On or about January 8, 2017, the Treasury Department, Office of Foreign Assets Control ("OFAC") designated two individuals, Andrei Lugovoi and Dmitri Kovtun, who have been publicly identified as FSB officers, for their roles in the "extrajudicial killing of Alexander Litvinenko for his activities seeking to expose illegal activity carried out by officials of the Government of the Russian Federation."[2]

c. In or about 2018, Sergei Skripal, a former Russian military intelligence officer, and his daughter, were poisoned with a military-grade nerve agent in the United Kingdom.

---

[2] In or about 2012, the Magnitsky Act, formally known as the Russia and Moldova Jackson-Vanik Repeal and Sergei Magnitsky Rule of Law Accountability Act of 2012 (the "Magnitsky Act"), was enacted. The Magnitsky Act imposes sanctions on Russian officials deemed responsible for the death of Sergei Magnitsky, a Russian tax advisor who uncovered pervasive corruption and misconduct by Russian government officials before his death.

Skripal and his daughter were hospitalized and ultimately survived. In or about August 2018, in light of this attempted assassination, the State Department announced a first round of sanctions against the Russian Federation because it had "used chemical or biological weapons in violation of international law or . . . lethal chemical or biological weapons against its own nationals." On or about August 2, 2019, the State Department announced a second round of sanctions against the Russian Federation "for its use of a 'novichok' nerve agent in an attempt to assassinate Sergei Skripal and his daughter Yulia Skripal [which] endangered thousands of lives" in the area near the attempted assassination. In or about 2022, the U.S. Embassy in Georgia issued a statement in which it noted, among other things, that "British authorities charged in absentia two Russian military intelligence officers with conspiracy to murder, attempted murder and use of the Novichok nerve agent" and that the United States and other nations had expelled Russian diplomats and intelligence officers "in support of the U.K. and in protest of the poisonings." The U.S. Embassy further said that Russian President Vladimir Putin had "falsely claimed" that the attackers arrested in the case were "not criminals," and that RT and Sputnik, two sanctioned and Russian state-controlled networks, produced "hundreds of misleading stories" about the attack.

d. In or about August 2019, Zelimkhan Khangoshvili, a former commander in the second Chechen war, was killed in Berlin, Germany. In or about December 2021, a German court ruled that "state organs of the central government of the Russian Federation" were responsible for the murder. Germany declared two diplomats working at Russia's embassy "personas non grata," and the German Foreign Minister called it a "state-ordered murder."

e. In or about 2024, Alexei Navalny, a vocal critic of Russian President Vladimir Putin, died while in custody in a Russian prison. Navalny had been arrested on or about January 17, 2021, when he returned to a Moscow airport from Germany after recovering from a

near-fatal nerve agent poisoning. Publicly reported U.S. government assessments have concluded that "Russia's FSB officers used the nerve agent Novichok to poison Navalny, causing him to fall gravely ill." In or about March 2021, OFAC, the State Department, and the U.S. Department of Commerce announced concurrent sanctions in response to Russia's poisoning and subsequent imprisonment of Navalny. In announcing the designation, the then-Secretary of the Treasury said that "the Kremlin's use of chemical weapons to silence a political opponent and intimidate others demonstrates its flagrant disregard for international norms." On or about August 20, 2021, OFAC and the State Department announced further designations concerning Navalny's poisoning, calling it a "state-sponsored poisoning" of a "Russian opposition leader" and noting that it was "the third use of Treasury's discretionary authorities to respond to Russia's use of Novichok against its own citizens."

f. More recently, countries throughout Europe have accused Russia of sabotage operations and extrajudicial targeting. For example, in or about September 2026, a German investigation reportedly linked the GRU's military intelligence services to a drone attack at the Leipzig/Halle Airport in Germany.[3] The German Foreign Minister declared that the attack was a recent example of Russia's "long series of attempts at destabilization, disinformation, threats, sabotage and aggression directed at Europe."

## <u>THE RIS NETWORK COORDINATES TERRORIST ACTS ON BEHALF OF THE RUSSIAN FEDERATION</u>

*July – August 2026: Recruitment of a U.S. Resident to Murder a Victim in the United States*

4. In or about the summer of 2026, the RIS Network recruited a Venezuelan citizen in the United States ("U.S. Resident-1") to surveil and murder a prominent Russian dissident

[3] The GRU is the Main Directorate of the General Staff of the Russian Armed Forces. It is Russia's foreign military intelligence agency and both controls military intelligence and operates its own special forces units.

("Victim-1") who the RIS Network believed was residing in the United States. More specifically:

a. On or about July 29, 2026, ANGEL EDUARDO CASTRO, the defendant, a Venezuelan national living in Russia, contacted U.S. Resident-1 (who was living in Brooklyn, New York, at the time) over an encrypted messaging application ("Application-1") and wrote, in part, "[d]o you have someone in Washington you trust? . . . Because of my time in Russia they always reach out for something where people are located elsewhere. They pay money for pictures of places."[4] CASTRO then forwarded U.S. Resident-1 a voice message, later determined to be from YAIDEL DELGADO SUAREZ, a/k/a "Viking," the defendant, a Cuban national living in Russia, in which SUAREZ told CASTRO, in coded language, that SUAREZ wanted to hire someone to carry out surveillance ("measure a plot of land and provide measurements") in their murder ("construction") plot: "What's up with your guy from Washington? I don't need him to do construction. I need him to measure a plot of land and provide measurements."[5]

b. Later that day, CASTRO forwarded to U.S. Resident-1 a second message from SUAREZ, which stated, in part, "[p]hotos and videos of a particular address and location. There needs to be a key in the video where someone has their hand in it with the thumb up (there is an emoji with a hand making the okay symbol). This is gravely serious work. The pay for it is $1,000 to $1,500. The video needs to be no less than 30 seconds from different angles." Next, CASTRO forwarded another voice message from SUAREZ in which SUAREZ stated that the address provided to surveil was for someone (later determined to be Victim-1) who they "want to eliminate they want to disappear" and offered "$40,000 for whoever does the work." In response

[4] All of the communications between and among CASTRO, SUAREZ, and U.S. Resident-1 took place in Spanish, and the translations contained in this Indictment are drafts subject to revision.

[5] Both CASTRO and SUAREZ were in Russia during the communications contained in this Indictment.

to the message concerning the desire to "eliminate" or "disappear" Victim-1, U.S. Resident-1 said to CASTRO that he was willing to "take pics if [SUAREZ] wants" but would not do "the other stuff," *i.e.*, "eliminate" Victim-1, himself.

c. SUAREZ, CASTRO, and U.S. Resident-1 continued to exchange messages over the ensuing days and weeks concerning the plot. On or about August 26, 2026, CASTRO wrote that his "friend," *i.e.*, SUAREZ, was "asking for [U.S. Resident-1's] number so he can go direct with you," and U.S. Resident-1 responded, in part, "Dont' have him call me. That's crazy. Can we talk through you so it gets disguised? Otherwise he tells me directly so they can connect the communications. You know they track everything here."

d. Nonetheless, on or about August 26, 2026, SUAREZ messaged U.S. Resident-1 directly, and told him specifically how to take the surveillance videos and emphasized that the surveillance "has to be today or tomorrow." SUAREZ then instructed U.S. Resident-1 to delete their chat with the photographs of the surveillance locations and coordinates and to be "discrete and do it from afar" when U.S. Resident-1 conducted the surveillance. That same day, SUAREZ sent U.S. Resident-1 the geolocation and address for one location, and a photograph and address of a second location, for U.S. Resident-1 to surveil. Both of those addresses were later determined to be publicly associated with Victim-1.[6] As is reflected in the following messages, SUAREZ originally received the location information from YURI KHRAMEEV, a/k/a "Colonel Yuri," the defendant (who used the messaging handle "Yuri Khrameev [combat]" in the communications), and then forwarded that information to U.S. Resident-1:

[6] As further detailed below, OEMIS ROMAGOZA DURRUTHY, the defendant, had photographs and videos of one of the same Victim-1 addresses in several of his online accounts.




e. On or about August 27, 2026, SUAREZ sent messages to U.S. Resident-1, providing explicit details about how U.S. Resident-1 should conduct the surveillance. For example, SUAREZ told U.S. Resident-1 to put his phone in airplane mode; to place his phone in his "left hand and record towards the house if you can," to "start a block before the neighborhood then slow down when your by the house," and to emphasize the house itself when taking the videos. U.S. Resident-1 then took multiple surveillance videos and photographs of the properties he was asked to surveil, at least some of which he sent to SUAREZ.

f. After U.S. Resident-1 sent the pre-operational surveillance videos and photographs to SUAREZ, U.S. Resident-1 and SUAREZ exchanged a series of messages. SUAREZ told U.S. Resident-1 that he had provided CASTRO with payment for U.S. Resident-1 as soon as U.S. Resident-1 had sent SUAREZ the surveillance videos. SUAREZ then asked U.S. Resident-1 if he had "someone who wants to do construction," referring to carrying out the murder, or if U.S. Resident-1 would be "interested" in doing it himself. U.S. Resident-1 replied that CASTRO had "mentioned it to me" and that U.S. Resident-1 would "see if I can find the right people and will let you know." SUAREZ responded and noted that he was facing time pressure from his "boss" and that, although he had another team in Mexico who could carry out the murder, they were not available immediately: "Let me know as soon as possible because I have a chain and my boss has questions. I have people in Mexico right now and theyre delayed. I only need a

response to know if someone can do the work. It doesn't have to be today or tomorrow just need to know if the can. Ask [CASTRO], the money is here." U.S. Resident-1 responded, "I have someone but I have to ask first to see if they say yes. Ill let you know in about three days."

5. In addition to U.S. Resident-1, YAIDEL DELGADO SUAREZ, a/k/a "Viking," the defendant, attempted to recruit multiple additional individuals to conduct pre-operational surveillance and murder Victim-1 and other potential targets in the United States. SUAREZ (and at least one other person) recruited these individuals over encrypted messaging applications and offered to pay them substantial sums of money to carry out the targeting of the U.S.-based victims.

*2025: The RIS Network Solicits a U.S. Person to Carry Out a Murder in Lithuania*

6. Approximately one year earlier, in or about 2025, the RIS Network tried to carry out a similar scheme by attempting to recruit a U.S. citizen ("U.S. Citizen-1") to surveil and then murder an individual who the RIS Network described as a "bad guy" who was "telling lies about Russia," and who was believed to live in exile in the vicinity of Vilnius, Lithuania ("Victim-2"). U.S. Citizen-1 accepted approximately $200 to surveil and take photographs of Victim-2's purported address but ultimately declined the approximately $25,000 offer to carry out the murder of Victim-2. More specifically:

a. On or about June 24, 2025, U.S. Citizen-1 encountered an individual later identified as KIRILL KHRAMEEV, the defendant, at the Estonia-Russia border. KIRILL KHRAMEEV offered to pay U.S. Citizen-1 to travel to a certain address in Vilnius, Lithuania, and take pictures of that address. U.S. Citizen-1 accepted the assignment, took pictures of the address, and sent them to KIRILL KHRAMEEV via Application-1. KIRILL KHRAMEEV then arranged for a person he described as his "boss" and a "colonel," later identified as YURI KHRAMEEV, the defendant, who used a screen name that appeared as "Combat Colonel Yuri" on Application-

1, to connect with U.S. Citizen-1 on Application-1.

b. Once in communication with U.S. Citizen-1, YURI KHRAMEEV instructed U.S. Citizen-1 to delete YURI KHRAMEEV's contact on Application-1 and move their communications to a second encrypted messaging application ("Application-2") where they continued their discussions:

i. YURI KHRAMEEV described himself as a "colonel" and informed U.S. Citizen-1 that he had worked with Russian President Vladimir Putin when they were young.

ii. YURI KHRAMEEV told U.S. Citizen-1 that a "bad guy" lived at the address that U.S. Citizen-1 had surveilled and photographed, and that U.S. Citizen-1 would be paid approximately $25,000 to kill him. YURI KHRAMEEV told U.S. Citizen-1 that U.S. Citizen-1 would "need to send [YURI KHRAMEEV] photos or videos of [Victim-2's residence] every 2-3 days" and that Victim-2 was being targeted because Victim-2 was "spreading dirt about my country." YURI KHRAMEEV further claimed that Victim-2 was "telling the media and the common people that the Russians are the aggressors" and Victim-2 was "distorting history."

iii. Using Application-1, YURI KHRAMEEV sent U.S. Citizen-1 a photograph of Victim-2 and told U.S. Citizen-1 to delete the photograph after viewing but assured him that he could re-send the photograph closer in time to when U.S. Citizen-1 was going to carry out the murder. YURI KHRAMEEV also described in explicit terms how the murder could be carried out, including by "throwing a bottle of gasoline" or by "sticking a knife" in Victim-2.

iv. U.S. Citizen-1 considered the offer but declined to help murder Victim-2 because U.S. Citizen-1 believed that the location was too open such that there was no way of carrying out the murder without getting caught, which U.S. Citizen-1 conveyed to YURI KHRAMEEV. In response, YURI KHRAMEEV wrote on Application-2 that he could instead

offer a "simpler job" which could include "set[ting] fire to a warehouse of property or food" or "throw[ing] a bottle of gasoline at an electrical substation," and that the price of the job would depend on factors such as "the intensity of the fire," "[t]he damage," and "[t]he resonance." YURI KHRAMEEV explained that he was interested in targeting "military facilities and dual-use facilities . . . located in the countries of the NATO military bloc," including "railway stations, fuel tanks, wagons with humanitarian aid to Ukraine, wagons with equipment, bus depots, tram depots, electronical substations, gas stations, industrial premises, any warehouses, and so on." And, the following day, YURI KHRAMEEV continued:

> I am interested in all the countries that are helping Ukraine . . . I've already written to you about what I need. I can repeat. For example, throw a bottle of gasoline at an electrical substation. Set fire to a warehouse of property or food. You're looking for such objects yourself. You need to approach it creatively . . . I'm offering serious money for serious work.

v. On or about August 25, 2025, YURI KHRAMEEV wrote on Application-2 again, emphasizing that U.S. Citizen-1 "shouldn't miss this opportunity" and writing "[i]f you are already cooperating with Western intelligence agencies, then as a colonel of Russian intelligence agencies, I will leave this game with dignity . . . And this could be the biggest mistake of your life. Yes. It's dangerous."

*Additional Attacks and the Role of Oemis Romagoza Durruthy in the RIS Network*

7. A fifth member of the RIS Network is OEMIS ROMAGOZA DURRUTHY, the defendant. DURRUTHY's responsibilities include, among other things, coordinating travel and payment for acts of terrorism committed by the RIS Network, and obtaining pre-operational surveillance of potential targets. For example:

a. In or about June 2024, DURRUTHY paid and coordinated travel for a criminal associate ("Associate-1") to carry out attacks in Prague, Czechia. The Czech Prime

Minister has declared these attacks were "very likely" organized and financed by the Russian Federation. DURRUTHY, among other things and while in Russia, transferred over $1,000 in cryptocurrency to Associate-1 in advance of the attack; booked multiple hotel reservations for Associate-1 in Prague and in Poland, where Associate-1 traveled en route to the attack, in the days before and after the attack; and possessed photographs in his online accounts which show his communications with Associate-1, including communications in which DURRUTHY appeared to send Associate-1 potential attack sites in Warsaw, Poland:






In addition, DURRUTHY had in his online accounts a video of Associate-1 on an apparent training run for an arson attack, like the below-described attack committed in Lithuania, in which Associate-1 and another individual discussed directions to a particular location, and used words including "gas," "oil," and "fire," in reference to the anticipated attack.

b. In or about September 2024, a second attack coordinated by DURRUTHY took place at a Lithuanian manufacturer of mobile radio stations intended for the Ukrainian military in Šiauliai, Lithuania. Prosecutors in Lithuania have publicly announced that "the attempted sabotage . . . was carried out on the orders of and for the benefit of Russia's GRU." In advance of that attack, DURRUTHY booked travel reservations for another individual,

subsequently publicly identified as having been arrested in connection with this conduct, to travel to Lithuania around the time of the attack, and additionally made several reservations for transport within Lithuania in the days before and after the attack. DURRUTHY and another criminal associate ("Associate-2") were in frequent communication in the months surrounding the attack, and exchanged approximately 243 communications between on or about October 29 and December 3, 2024.[7] In addition, in the days and weeks around the time of the attack, DURRUTHY was in communication with YURI KHRAMEEV, a/k/a "Colonel Yuri," the defendant, who used the same phone number as he used in his communications with U.S. Resident-1, described above. DURRUTHY and Associate-2 have both been charged in Lithuania in connection with the September 2024 attack and related conduct, and the case remains pending.

c. Similarly, DURRUTHY and YURI KHRAMEEV exchanged multiple messages over Application-1 between on or about November 10 and 26, 2025. DURRUTHY, in several of his online accounts, possessed videos and/or photographs of one of the residences associated with Victim-1 that was surveilled by U.S. Resident-1 in or about August 2026. *See supra* ¶ 4(d). Certain of those files indicate that they were taken and/or saved by DURRUTHY in or about November 2025—*i.e.*, during the time period when DURRUTHY was in close contact with YURI KHRAMEEV. The media includes photos and videos of the inside of one of Victim-1's dwellings, and at least one photograph found in DURRUTHY's accounts appears to be the same photograph that SUAREZ sent to U.S. Resident-1 in connection with U.S. Resident-1's efforts to surveil and murder Victim-1, and which was originally sent by YURI KHRAMEEV to SUAREZ, as further described above, *see supra* ¶ 4(d).

[7] More recently, Associate-2 was in contact with another member of the RIS Network. More specifically, YAIDEL DELGADO SUAREZ, a/k/a "Viking," the defendant, exchanged approximately 96 messages with Associate-2 over Application-1 between on or about August 27 and September 10, 2026.

d. In or about May 2026, DURRUTHY booked travel for YURI KHRAMEEV and SUAREZ. YURI KHRAMEEV traveled between Minsk, Belarus and St. Petersburg, Russia. SUAREZ traveled between St. Petersburg, Russia and Moscow, Russia.

## STATUTORY ALLEGATIONS

## COUNT ONE
**(Conspiracy to Finance Terrorism)**

The Grand Jury charges:

8. The allegations contained in paragraphs 1 through 7 of this Indictment are repeated and realleged as if fully set forth herein.

9. From at least in or about 2024, up to and including in or about September 2026, in Russia, Estonia, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, YURI KHRAMEEV, a/k/a "Colonel Yuri," KIRILL KHRAMEEV, OEMIS ROMAGOZA DURRUTHY, YAIDEL DELGADO SUAREZ, a/k/a "Viking," and ANGEL EDUARDO CASTRO, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, knowingly and willfully combined, conspired, confederated, and agreed together and with each other to provide and collect funds, directly and indirectly, with the intention and the knowledge that they were to be used, in full or in part, to carry out a terrorist act, to wit, any act intended to cause death and serious bodily injury to a civilian, and to any other person not taking an active part in hostilities in a situation of armed conflict, the purpose of which, by its nature and context, was to intimidate a population, and to compel a government to do and to abstain from doing any act, and (i) where the offense takes place in the United States, and a perpetrator was a national of another state or a stateless person, and a perpetrator is found outside the United States, and the offense was directed toward or resulted in the carrying out of a predicate act against

a national of another state; and (ii) where the offense takes place outside the United States and a perpetrator is a national of the United States or is a stateless person whose habitual residence is in the United States, a perpetrator is found in the United States, and was directed towards or resulted in the carrying out of a predicate act against any national of the United States or property of such national.

(Title 18, United States Code, Sections 2339C and 3238.)

**COUNT TWO**
**(Murder-for-Hire Conspiracy)**

The Grand Jury further charges:

10. The allegations contained in paragraphs 1 through 7 of this Indictment are repeated and realleged as if fully set forth herein.

11. From at least in or about July 2026, up to and including at least in or about September 2026, in the Southern District of New York and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular State or district, YURI KHRAMEEV, a/k/a "Colonel Yuri," YAIDEL DELGADO SUAREZ, a/k/a "Viking," and ANGEL EDUARDO CASTRO, the defendants, and others known and unknown, at least one of whom is expected to be first brought to and arrested in the Southern District of New York, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to travel in and cause another person to travel in interstate and foreign commerce, and to use and cause another person to use the mail and a facility of interstate and foreign commerce, with intent that a murder be committed in violation of the laws of a State and the United States as consideration for the receipt of, and as consideration for a promise and agreement to pay, a thing of pecuniary value, to wit, YURI KHRAMEEV, SUAREZ, and CASTRO, all of whom were residing in Russia at the time, recruited an individual in the United States and agreed to pay him to surveil a prominent Russian

dissident living in the United States and to recruit another individual to kill the prominent Russian dissident.

(Title 18, United States Code, Sections 1958 and 3238.)

**FORFEITURE ALLEGATIONS**

12. As a result of committing the offense alleged in Count One of this Indictment, YURI KHRAMEEV, a/k/a "Colonel Yuri," KIRILL KHRAMEEV, OEMIS ROMAGOZA DURRUTHY, YAIDEL DELGADO SUAREZ, a/k/a "Viking," and ANGEL EDUARDO CASTRO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C), (G), & (H), and Title 28, United States Code, Section 2461(c), any and all assets, foreign and domestic, of the defendants; any and all assets, foreign and domestic, affording the defendants a source of influence over any entity or organization engaged in planning or perpetrating said offense; any and all assets, foreign and domestic, acquired or maintained with the intent and for the purpose of supporting, planning, conducting or concealing said offense; any and all assets, foreign and domestic, derived from, involved in, or used or intended to be used to commit said offense; and any and all property, real or personal, which constitutes or is derived from proceeds traceable to said offense, including but not limited to a sum of money in United States currency representing said assets and property.

13. As a result of committing the offense alleged in Count Two of this Indictment, YURI KHRAMEEV, a/k/a "Colonel Yuri," YAIDEL DELGADO SUAREZ, a/k/a "Viking," and ANGEL EDUARDO CASTRO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the

commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

**Substitute Assets Provision**

14. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON
9-15-26

James M. McDonald
JAMES M. MCDONALD
United States Attorney